In the Matter of MICHEL LACHANCE, Petitioner, v RICHARD CORBISIERO, as Chairman of the New York State Racing and Wagering Board, Division of Harness Racing, et al., Respondents.

In the Matter of HENRI FILION, Petitioner, v RICHARD CORBISIERO, as Chairman of the New York State Racing and Wagering Board, Division of Harness Racing, et al., Respondents.

In the Matter of RENE POULIN, Petitioner, v NEW YORK STATE RACING AND WAGERING BOARD, DIVISION OF HARNESS RACING, Respondent.

First Department, May 11, 1989

APPEARANCES OF COUNSEL

*Marvin Newberg* of counsel *(Newberg Law Offices, P. C.,* attorneys), for Michel LaChance, petitioner.

*Thomas J. Hughes, Jr.,* of counsel *(O'Dwyer & Bernstein,* attorneys), for Henri Filion, petitioner.

*Irwin R. Cohen* of counsel *(Cohen, Hurkin, Ehrenfeld, Pomerantz & Tenenbaum,* attorneys), for Rene Poulin, petitioner.

*Frederic L. Lieberman* of counsel *(Robert Abrams, Attorney-General,* attorney), for respondents.

## OPINION OF THE COURT

SMITH, J.

Petitioners in each of three proceedings challenge determinations by respondent New York State Racing and Wagering Board (the Board), following a consolidated hearing, suspending or revoking their licenses to operate as harness owners, trainers and drivers. Each proceeding was transferred to this court by the Supreme Court pursuant to CPLR 7804 (g).

The charges against each of the petitioners arise out of the conduct of the fourth race at Yonkers Raceway, run on November 14, 1987. In this "trifecta" race, in which triple combination wagering for the first three winners was permitted, suspicion that the race was fixed arose, in part, as a result of the unusually large number of winning tickets purchased at a single Off Track Betting (OTB) location in Manhattan. All told, there were $73,281 in winnings as a result of tickets sold at that location. Computer records maintained by the Board revealed that 48 $50 tickets were purchased selecting either

"Pan Am Sam" or "Hobart Star" to win, followed by either "Falcons Mann" or "Handy Yankee". Additionally, five winning tickets for $150 each were purchased selecting the correct order of finish: "Falcons Mann" followed by "Hobart Star" followed by "Handy Yankee". The amount of betting on the winner, "Falcons Mann", was unusual because the betting odds against the horse winning were 18 to 1. It was possible, however, that the last series of 5 $150 tickets was purchased as a "hedge" by the same person(s) who had earlier wagered some 48 $50 bets at the same betting location.

Three track judges who had watched the race at Yonkers were suspicious of the conduct of most of the drivers in that race. They conducted an investigation, as a result of which six drivers were suspended. Leo Bauer, the driver of the winning horse "Falcons Mann", was not charged.

The six suspended drivers appealed to the respondent and the suspensions were challenged in a consolidated hearing held over 12 days between December 15, 1987 and January 13, 1988. (Racing, Pari-Mutuel Wagering and Breeding Law §§ 309, 321; State Administrative Procedure Act art 3.) The witnesses at the hearing included the track judges, the charged drivers, Leo Bauer, veterinarians and the manager of the New York City OTB computer betting system. Thereafter, respondent Board confirmed the Hearing Officer's findings that petitioners had violated the Board's rules and these proceedings followed.

### Matter of Michel LaChance

Michel LaChance challenges a determination by the respondent finding that he drove with a lack of effort and suspending his license as a harness owner, trainer and driver for 30 days.[1] The proceeding was transferred to this court by order of the Supreme Court, New York County (Cohen, J.), entered July 8, 1988.

Petitioner Michel LaChance drove "Hobart Star", the second favorite horse and finished second in the race. LaChance was charged by the track judges with driving with a lack of effort (9 NYCRR 4117.4 [p]) and driving in a manner inconsistent with his drive in an earlier race, run on November 4, 1987. (9 NYCRR 4117.4 [n].) Respondent failed to produce any

---

1. By stipulations dated March 1, 1988 and February 21, 1989, the parties agreed to stay enforcement of the suspension of petitioner's license pending a determination in the proceedings.

evidence as to the latter charge and it was dismissed by the Hearing Officer.

As to the first charge, the Hearing Officer's finding that LaChance had driven with a lack of effort was based upon the testimony of the three track judges who had viewed both the actual race and a videotape of it. At the start of the race, both "Falcons Mann" and "Hobart Star" "left" the gate, that is, broke quickly out of the gate. "Falcons Mann" took the lead and "Hobart Star" followed. The judges concluded that since LaChance was driving the better horse, he should not have let "Falcons Mann" get in front of him and, in any event, should have attempted to retake the lead. The judges believed that LaChance failed to follow the lead horse closely enough, thereby preventing "Hobart Star" from gaining an opportunity to pass the lead horse on the outside. Further, they faulted petitioner for allowing his horse to fall behind one-half length prior to the final turn.

LaChance testified that it was his strategy to follow the lead horse around the track, a racing strategy called "sitting in the two hole". According to LaChance, he chose to follow the lead horse and fell back slightly before the stretch in order to make the lead driver think that LaChance was not gaining and in order to create room to come in along the rail and win the race.

Significantly, none of the respondent's witnesses disputed that the "two hole trip" is an advantageous racing strategy or that LaChance ran that type of race on October 27, 1987 and won. Alvin Landau, presiding judge emeritus of the United States Trotting Association, testified on behalf of LaChance that in his expert opinion LaChance had not driven with a lack of effort.

Moreover, according to LaChance he would have been able to pass the lead horse "Falcons Mann" on November 14th and thus win that race had Leo Bauer not cut "Hobart Star" off in the stretch. "Veering" in the stretch is a violation of the Board's rules. (9 NYCRR 4117.4 [1].) Although LaChance had filed no objection to Bauer's conduct, Bauer admitted to same at the hearing. Bauer testified that during the stretch LaChance was trying to come down on the rail (and) come through, but "I cut him short. I didn't give him the room to get through." Track Judge Anthony Stellone, testifying for the respondent, similarly stated, "when they got into the stretch, he looked like he made an attempt to go through on the inside, but there wasn't enough room to get through."

■ The conduct of harness racing is a specialized sport and much will appear to experts which is not apparent to lay persons. As respondent argues, there are many subtle ways in which petitioner could have deliberately attempted not to win which might not be apparent to the general public. However, all of the expert opinion against LaChance failed to adduce any examples of action, subtle or otherwise, by LaChance which were inconsistent with an effort to win. The track judges apparently disregarded evidence that LaChance was in a position to win at all times and, in fact, might have won had he not been cut off in the stretch. At least one of the track judges admitted that his view of the race and his conclusions might have been different had it not been for the unusual betting associated with the race. However, there was no evidence linking LaChance with any scheme to "fix" the race. Indeed, many of the $50 tickets purchased at the OTB parlor where the unusual betting occurred were bet on "Hobart Star" to win. Hence, it can be argued that LaChance would have had a greater interest than not in placing first, even if an illegal betting scheme and his involvement in same had been established.

■ LaChance further argues that he was denied his right to confront the respondent's investigators with respect to allegations of a "fix". However, as previously indicated, no evidence of a scheme to "fix" the race was produced against him. Therefore, he could not have been prejudiced by their failure to testify.

■ We similarly reject petitioner's contention that the charge of driving with "indifference or lack of effort" (9 NYCRR 4117.4 [p]) is unconstitutionally vague. The term is sufficiently definite to give petitioner notice of what conduct is forbidden by the regulation and to prevent discriminatory application by the respondent. *(Cf., People v Smith,* 44 NY2d 613, 618 [1978].)

### *Matter of Rene Poulin*

Petitioner Poulin's license as a harness racing owner, trainer and driver was suspended for 30 days on the grounds that on November 14, 1987 he had driven "Handy Yankee" with a "lack of effort". (9 NYCRR 4117.4 [p].)[2] The proceeding was transferred to this court by order of the Supreme Court,

---

2. Suspension of petitioner's license has been stayed pending determination of this proceeding per agreement of the parties.

New York County (Ira Gammerman, J.), entered June 30, 1988.

"Handy Yankee" was the third favored horse and, in fact, placed third in the race. Petitioner, until the third quarter of the race, followed "Pan Am Sam", driven by Henri Filion. The track judges believed that Poulin failed to go around Filion until the home stretch when it was too late. Further, according to the judges Poulin failed to drive aggressively, appeared to be looking to his left during the stretch as if to count in what position he would finish and hesitated striking his horse in order to spur the horse on during the stretch.

Poulin's primary challenge to the evidence against him is that his horse raced with broken equipment. He testified that his horse was riding "rough", had taken some false steps and at one point almost broke stride. The trainer of "Handy Yankee" testified that as the horse pulled up and passed the viewing booth immediately after the race, he noticed the hopple on the horse was stretched and brought this to Poulin's attention. Hopples are lengths of strapping connected to the horse's legs which keep the horse in stride during a race. The horse's groom testified that while before the race the hopple was in good condition, before taking the horse back to its stall after the race, he also observed that the hopple was stretched. Petitioner testified that he reported the broken hopple to the paddock judges after the race.

The report prepared by Presiding Track Judge James Michaels after the race states that "Handy Yankee finished with a broken hopple". Michaels testified that his notation was based upon a report given by a paddock judge to one of the associate track judges, but that he had observed no evidence of broken equipment on Mr. Poulin's horse while watching the race.

On rebuttal, both the assistant paddock judge and the paddock judge testified that about 4 or 5 minutes after the race petitioner showed to each of them a broken hopple. Both of these judges indicated that the usual procedure for reporting broken equipment is to bring it to the attention of the judges at the conclusion of the race while the equipment and the drivers are still on the horse and that the hopple entered into evidence did not appear to be the one petitioner showed to them on the day of the race. It is difficult to discern from the videotapes of the race whether the hopple is broken.

Whether or not the hopple was broken during the race was a question of fact for the Hearing Officer to determine. The Hearing Officer was free to reject the credibility of petitioner's witnesses and to find that the delay and manner in which the broken hopple was brought to the attention of the paddock judges indicated that petitioner had not run the race with a broken hopple.

■ Unlike *Matter of LaChance,* there is substantial evidence to support the Hearing Officer's finding that Poulin drove with a lack of effort. Here, the track judges were able to articulate specific actions or omissions by Poulin which supported their opinions. There was evidence that Poulin looked to his left during the crucial stretch as if to determine where he would place and that he failed to spur his horse on by striking it in the home stretch. *(See, Matter of Belanger v New York State Racing & Wagering Bd.,* 99 AD2d 579 [3d Dept 1984].) Further, Judge Michaels testified that petitioner had stated that he is an aggressive driver and that a broken hopple would not have bothered him. "Since substantial evidence exists to support the board's determination, it must be sustained irrespective of whether a similar quantum of evidence is available to support another conclusion". *(Matter of Warner v New York State Racing & Wagering Bd.,* 99 AD2d 680, 681 [4th Dept 1984].)

As Poulin was not charged with attempting to "fix" the race, he was not prejudiced by respondent's failure to produce investigators with respect thereto or by the alleged dismissal by respondents of charges against Bauer in exchange for Bauer's testimony allegedly inculpating Filion in a "fix".

The penalty imposed by respondent was not so disproportionate to the offense as to be shocking to one's sense of fairness. *(Matter of Pell v Board of Educ.,* 34 NY2d 222, 233 [1974].)

### *Matter of Henri Filion*

Petitioner, Henri Filion seeks to annul respondent's determination, dated February 29, 1988, revoking his license as a harness racing trainer and driver. By order entered April 28, 1988, Supreme Court, New York County (per Lehner, J.), the matter was transferred to this court.

Petitioner was originally charged with driving in a manner inconsistent with an attempt to win (9 NYCRR 4117.4 [n]) and

ordered suspended for 90 days.[3] During the hearing, Filion was served with an amended notice alleging two additional charges: (1) fraud or other corrupt acts (Racing, Pari-Mutuel Wagering and Breeding Law § 309 [2] [c], [e] [i] [3]; 9 NYCRR 4119.7 [a] [3]; [b]; 4119.9 [a]); and (2) conduct between licensees creating an adverse reflection on the integrity of racing (9 NYCRR 4104.10 [a] [3]). After a hearing, all of the charges were sustained.

Petitioner drove "Pan Am Sam" the betting favorite in the race and came in fifth. In revoking petitioner's license, the Board determined that Filion (1) prior to the race, spoke with other drivers regarding tactics and the desired outcome of the race, (2) conspired with unknown person(s) to "fix" the outcome of the race, (3) drove "Pan Am Sam" contrary to the horse's demonstrated racing abilities, (4) made displays of effort which were "sham" in an attempt to create the impression that he was attempting to win, while it was his intention to finish out of the top three, and (5) falsely claimed that his horse was lame and unable to perform better. In support of its conclusion that petitioner's horse was able to perform better, the Board noted that "Pan Am Sam" was the favorite in the race, that there was unusual betting activity on the race and that the winning trifecta payoff was unusually low.[4]

Filion challenges the respondent's finding of race "fixing", claiming that the testimony of Leo Bauer, the winning driver, is untrustworthy due to Bauer's drug usage, previous violations of Board rules and prior inconsistent statements, and because of the circumstances giving rise to his written statement against petitioner. Moreover, Filion argues that the failure to produce the respondent's investigators to whom Bauer made the statement violated his right to due process.

Bauer testified that about 20 minutes prior to the race he had a conversation with Filion in which Filion "asked me how I liked my horse. I told him that I liked the horse. He asked me if I was leaving[5] the horse. I said I was leaving the horse

---

3. This court denied Filion's application for a stay pending appeal (M2496, 3964).

4. The manager of the OTB computer betting system testified that "historically when a horse is 18 to 1 in win pool * * * the triple payoff for a three dollar ticket would be 900 dollars to 1000 dollars." Most of the witnesses, including the drivers, agreed that a $192 payoff on the trifecta, as a result of the large number of bets placed on the winners, was unusually low.

5. The expression "leave" or "leaving" refers to the tactic of breaking quickly out of the gate.

anyway and he said that he would tell me the numbers on the track and I told him I didn't want to know." Bauer further testified that it was unusual for one driver to ask another about the condition of his horse and that, as to Filion's statement about giving him the numbers, he "understood it to mean he (Filion) was tampering with the race." Petitioner denied having had a conversation with Bauer.

On rebuttal Anahid Avakian, the trainer of "Falcons Mann", testified on behalf of respondent that she overheard a portion of the conversation between petitioner and Bauer in which "Falcons Mann" was mentioned and that after the race she questioned whether her horse was actually racing well or was allowed to win. James Marohn, another driver against whom charges were also pending, testified for respondent on rebuttal, stating that shortly before the race Filion asked him how he planned to drive his horse at the start. However, Marohn indicated that such conversations among drivers were commonplace.

Petitioner also claimed that his horse had become sick during the race. This claim was supported by the testimony of petitioner's veterinarian who conducted a visual examination of the horse sometime after the race. However, the track veterinarian examined "Pan Am Sam" after the race and found nothing wrong with the horse. Clearly, respondent was free to credit the testimony of its witness over that of the petitioner. (Matter of Webster v Van Lindt, 117 AD2d 555, 557 [1st Dept 1986].)

■ Respondent's finding of race fixing rests primarily upon the testimony of Leo Bauer. However, not only is this testimony far from conclusive, but the circumstances surrounding the calling of Bauer as a witness for the respondent raise substantial doubt as to his credibility. In a motel room, at approximately 11:35 P.M. on December 14, 1987, the night before scheduled commencement of unrelated disciplinary proceedings against Bauer, as well as the subject disciplinary proceedings against petitioner, Bauer executed a statement implicating Filion. This written statement, given to respondent's investigators, followed several prior oral statements in which Bauer denied that any such conversation ever took place. The unrelated disciplinary proceeding by respondent against Bauer for substance abuse was rescinded on December 15. Bauer's explanation at the hearing that he did not come forward with this information earlier because he did not realize the severity of the situation further erodes his credibil-

ity. The testimony of Anahid Avakian, the trainer of "Falcons Mann", while corroborating Bauer's testimony regarding a conversation in the face of Filion's denial that one occurred, falls short of establishing Filion's involvement in a scheme to "fix" the race. The testimony of James Marohn is similarly inconclusive.

While the decision by the Westchester County District Attorney not to criminally prosecute for race "fixing" any one of the parties involved is not determinative (cf., Matter of Webster v Van Lindt, supra, at 557), it does warrant some consideration. The letter of the Westchester County District Attorney to the chairperson of the respondent Board states in part:

"The betting patterns regarding the wagering on this race were explored in great detail and are at best equivocal as evidence of a fixed race * * *. The total of their (the experts') testimony established only that one, or probably more than one, bettor at several different OTB offices made substantial wagers either on the winning horse or on the winning triple combination of 7-1-4. The experts acknowledged that the various betting patterns may be the result of a syndicated or cooperative hedged betting system which indicated that the syndicate was unsure of the result and were attempting to 'save' themselves * * *.

"Further, the OTB computer also failed at some time during the betting on this race leaving the nature and timing of some bets in question."

Substantial evidence "means such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact". (300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d 176, 180 [1978]; Matter of Webster v Van Lindt, supra, at 556 [1st Dept].) Substantial evidence does not arise from mere surmise, conjecture, speculation or rumor. (300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d, at 180, supra.)

The facts herein are unlike those in Matter of Webster v Van Lindt (supra), Matter of Warner v New York State Racing & Wagering Bd. (99 AD2d 680 [4th Dept 1984]) or Gleason v New York State Racing & Wagering Bd. (98 AD2d 964 [4th Dept 1983]) wherein unequivocal admissions as to race "fixing" or "sitting out" the race were attributable to the disciplined licensees. Here, the evidence against Filion is equivocal at best. Bauer's testimony, even if credited, when considered

with all the other evidence is insufficient to support respondent's finding that Filion conspired to "fix" the race, much less to impute to him advance knowledge of the race results.

There is ample support in the record, however, for respondent's conclusions that Filion drove in a manner inconsistent with an attempt to win (9 NYCRR 4117.4 [n]) and that his conduct in speaking with Bauer and Marohn, while not establishing his conspiracy in a scheme to "fix" the race, did create an appearance or suggestion reflecting adversely on the integrity of racing (9 NYCRR 4104.10 [a] [3]).

Unlike LaChance who had previously won by staying "in the two hole", an accepted racing strategy, petitioner Filion did not "leave" with "Pan Am Sam", kept the horse back from the start, made the horse run the entire trip on the outside of the track and did not "cover up"[6] the horse. "Pan Am Sam" previously had been driven by Filion and had never been run in a similar manner. Further, Filion did not whip his horse when the horse failed to respond.

Accordingly, respondent's order of February 29, 1988 finding that LaChance violated 9 NYCRR 4117.4 (p) and suspending his license for 30 days should be annulled on the law; respondent's order of February 29, 1988 finding that Rene Poulin violated 9 NYCRR 4117.4 (p) and suspending his license for 30 days should be confirmed; and so much of respondent's order of February 29, 1988 as revoked the license of Henri Filion for conspiring to "fix" the results of the fourth race (Racing, Pari-Mutuel Wagering and Breeding Law § 309 [2]; 9 NYCRR 4119.7 [a] [3]; [b]; 4119.9 [a]) should be annulled on the law, the order otherwise confirmed and the matter remanded to respondents to set an appropriate penalty, all without costs and disbursements.

MURPHY, P. J., ASCH, ROSENBERGER and RUBIN, JJ., concur.

In *Matter of LaChance v Corbisiero:* Determination of respondents, dated February 29, 1988, annulled, on the law, without costs and without disbursements.

In *Matter of Filion v Corbisiero:* So much of the determination of respondents, dated February 29, 1988, as revoked the license of the petitioner, is annulled, on the law, the determination otherwise confirmed, and the matter remanded to

---

6. "Cover up" refers to driving behind another horse. Filion testified that this technique cuts the wind resistance or wind speed and that in his experience 95% of horses, including "Pan Am Sam", run better when another horse is blocking the wind from it.

respondents to set an appropriate penalty, without costs and without disbursements.

In *Matter of Poulin v New York State Racing and Wagering Board:* Determination of respondents, dated February 29, 1988, confirmed, without costs and without disbursements.